**ACADEMY FACILITIES MANAGEMENT,**
Plaintiff,

v.

**UNITED STATES, Defendant,**

v.

**IAP World Services, Inc., Defendant–Intervenor.**

No. 09–302C.

United States Court of Federal Claims.

Filed: June 5, 2009.

Redacted Version Issued for Publication: June 17, 2009.[1]

1. This opinion was issued under seal on June 5, 2009. The parties proposed redactions to the opinion, which were incorporated into this version, and reflected in the text of the opinion with "[deleted]."

William A. Roberts, III, Wiley Rein LLP, Washington, D.C., for the plaintiff. Of counsel, Daniel P. Graham, Paul F. Khoury, Richard B. O'Keefe, Jr., and Tracye W. Howard, Wiley Rein LLP, Washington, D.C.

Steven M. Mager, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for the defendant. With him were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, and Mark A. Melnick, Assistant Director, Commercial Litigation Branch.

J. Alex Ward, Jenner & Block LLP, Washington, D.C., for the defendant-intervenor. Of counsel, Daniel E. Chudd and Damien C. Specht, Jenner & Block LLP, Washington, D.C.

## OPINION

HORN, J.

### FINDINGS OF FACT

Plaintiff Academy Facilities Management (AFM)[2] filed a post-award bid protest with the court on May 13, 2009. Solicitation No. N40080–08–R–0512 was issued April 18, 2008 by the Public Works Department of the United States Naval Academy, Annapolis, Maryland (Navy), for Base Operating Support (BOS)[3] at the United States Naval Academy and other locations. The BOS contract was awarded to intervenor IAP World Services, Inc. (IAP). Plaintiff AFM was the incumbent on the last BOS contract awarded for the Naval Academy. At the court's initial hearing, on May 14, 2009, defendant indicated that incumbent AFM's current BOS contract will expire July 31, 2009. Defendant further indicated that the Navy intends to begin a transition from plaintiff and incumbent AFM to intervenor and awardee IAP on June 2, 2009. In light of the transition, plaintiff filed a motion for preliminary injunction on May 19, 2009, leading the court to schedule a June 1, 2009, second hearing and decision announcement, prior to the initiation of the proposed transition. Plaintiff seeks a declaration that the award to IAP was arbitrary and capricious, and injunctive relief to reopen discussions, with an opportunity for revised proposals, and a new source selection decision by the Navy. At the June 1, 2009, hearing on the record, the court issued a bench ruling denying injunctive relief to the plaintiff, and granting defendant's and inter-

---

**2.** AFM is a joint venture between Del–Jen, Inc., owned by Fluor Corporation, and EMCOR Government Services, owned by EMCOR Group, Inc.

**3.** Base Operating Support consists of maintenance, repair, alteration, demolition, minor construction and related functions for facilities and utility systems.

venor's motions for judgment on the administrative record. This written opinion reduces the oral opinion to writing.

The solicitation contemplated both firm fixed price contract line items and indefinite delivery, indefinite quantity contract line items. According to the solicitation, the award was to be made to the offer "most advantageous (best value) to the Government, price and other factors considered." Offerors submitted a price proposal, and a past performance and technical proposal. Section M.3 of the solicitation, titled "Evaluation Criteria," provided that:

> The objective of this source selection is to select the offeror whose proposal provides the best value to the Government. The offeror's proposal shall contain a response to each of the evaluation factors and shall be in the form prescribed by this solicitation. Evaluation factors are divided into three categories: technical evaluation factors (Factors A through E), past performance, and price. The technical evaluation factors are:
>
> Factor A—Relevant Experience
> Factor B—Technical Approach/Methods
> Factor C—Management
> Factor D—Safety
> Factor E—Small Business Subcontracting Effort
>
> All technical evaluation factors are considered equal in importance to one another, and when combined are approximately equal to past performance and price.[4] All proposals will be evaluated for price reasonableness and performance risk. Those proposals that are determined to be unreasonably priced or demonstrate significant performance risk will be appropriately discounted during the evaluation process. Award shall be made to the offeror whose offer, conforming to the solicitation, has been evaluated as most advantageous (best value) to the Government, price and other factors considered.

Section M.4 of the solicitation, titled "Evaluation Factors," indicated that the above listed technical evaluation factors would be assigned an adjectival rating, either Excellent, Very Good, Satisfactory, Marginal, or Unsatisfactory.[5] Both AFM and IAP received [deleted] for [deleted] of the technical evaluation factors. IAP received [deleted] and plaintiff received [deleted]. All other ratings for these two offerors were [deleted]. Both received a [deleted] in Small Business Subcontracting and plaintiff also received a [deleted] for Management. Section M.4 of the solicitation defined Excellent as follows:

> Proposal/factor is well prepared and readily understandable. The Proposal demonstrates a thorough and detailed understanding of the requirements for successful contract performance. Technical approach and capabilities significantly exceed performance and capability requirements and standards. Dependent on the factor, the proposal includes unique, innovative solutions and resources, extensive breadth and depth of relevant experience or past performance, or similar factor specific qualities. Proposal offers one or more strengths, and no deficiencies. Strengths significantly outweigh weaknesses, if any. Proposal/factor should have no significant weaknesses and identified weaknesses should be easily corrected. For past performance, the relevant past performance evaluation ratings and reference responses demonstrate that the offeror's performance met all contractual requirements and exceeded many requirements to the Government's benefit. Performance of relevant completed contracts either was consistently of the highest quality or exhibited a trend of becoming so. The proposal and past performance record leads to a strong expectation of successful performance and may provide additional benefit to the Government.

---

4. The Source Selection Advisory Board interpreted this language to mean that technical factors, past performance, and price were all of equal importance and weight in the best value determination. There was no objection from the parties over this interpretation.

5. A Neutral rating also could be used, but only for the Past Performance Factor, when the offer lacked a record of relevant past performance history. This rating was not employed by the Navy for either AFM's or IAP's proposals.

Section M.4 of the solicitation defined Very Good as follows:

> Proposal/factor is well prepared but may have minor flaws or ambiguities, which do not impact successful contract performance. The proposal demonstrates a thorough understanding of the requirements for successful contract performance. Technical approach and capabilities exceed performance and capability requirements and standards. Proposal offers one or more strengths and no deficiencies. Strengths outweigh weaknesses, if any, and provide some additional value to the government and/or minimize the risk to the government of unsuccessful performance. For past performance, the relevant past performance evaluation ratings and reference responses demonstrate that the offeror's performance met contractual requirements and exceeded some requirements to the Government's benefit. Performance of relevant completed contracts either was consistently of good quality or exhibited a trend of becoming so. The proposal and past performance record leads to a strong expectation of successful performance.

The above adjectival ratings were applied not only to each technical evaluation factor, but also were used to assign an overall rating to the technical proposals of offerors.

Section M.4 provided the following descriptions to assist Navy evaluators in deriving the adjectival rating for each technical evaluation factor:

a. Significant Strength: A proposed method or technique in the proposal that has a high magnitude of value to the Government and appreciably increases the likelihood of successful contract performance.

b. Strength: A proposed method or technique in the proposal that is of value to the Government and increases the likelihood of successful contract performance.

c. Weakness: A flaw in the proposal that increases the risk of unsuccessful contract performance.

d. Significant Weakness: A flaw that appreciably increases the risk of unsuccessful contract performance.

The above-quoted definitions of Excellent and Very Good contain these same descriptive terms, such as Strengths, Weaknesses, and Significant Weaknesses.

Five proposals were received in response to the solicitation. Three offerors were selected for the competitive range—AFM, IAP, and one other offeror denominated "Offeror C." A Technical Evaluation Board (TEB) reviewed the final proposal revisions of the offerors in the competitive range, and produced the following ratings, which were agreed with and adopted by the Source Selection Advisory Board and, ultimately, by the Source Selection Authority:

| Technical Evaluation Factors | Offeror C | IAP | AFM |
|---|---|---|---|
| A: Relevant Experience | [deleted] | [deleted] | [deleted] |
| B: Technical Approach/Methods | [deleted] | [deleted] | [deleted] |
| C: Management | [deleted] | [deleted] | [deleted] |
| D: Safety | [deleted] | [deleted] | [deleted] |
| E: Small Business Subcontracting Effort | [deleted] | [deleted] | [deleted] |
| Overall Technical Evaluation Rating | [deleted] | E | [deleted] |
| Past Performance Rating | [deleted] | E | [deleted] |

In the above table, E is Excellent, VG is Very Good, S is Satisfactory, and M is Marginal.

A Price Evaluation Panel reviewed price proposals of the three offerors in the competitive range, totaling the firm fixed price and indefinite delivery, indefinite quantity portions of the contract for the base year and the eight option years, and comparing the result with the Independent Government Estimate (IGE). The final price proposal revisions, which were adopted by the Source Selection Advisory Board and, ultimately, by the Source Selection Authority, are portrayed in the following table:

| SSAB/SSA Ranking | Offeror | Technical Rating | Past Performance | Total Price |
|---|---|---|---|---|
| 1 | IAP | E | E | $186,673,244.48 |
| 2 | AFM | [deleted] | [deleted] | [deleted] |
| 3 | Offeror C | [deleted] | [deleted] | [deleted] |
| | IGE | | | [deleted] |

In the above table, E is Excellent, S is Satisfactory, and M is Marginal.

The Source Selection Advisory Board ranked IAP number one of the three offerors in the competitive range because:

IAP has the best, most comprehensive and sophisticated proposal of all three offerors. The IAP World Services offer is complete, realistic, and reasonable. Their price of $186,673,244 is well below the IGE. It is [deleted] lower than the number two ranked offeror, AFM.... [T]he SSAB believes that the IAP technical proposal is better than the AFM proposal in terms of the sophistication of the approach and some of the additional services offered. As a result of the better IAP Technical Proposal and the lower cost of the IAP proposal, the SSAB conclusion is that the additional cost to award the contract to AFM did not represent a best value to the Government and thus was not justified.

The Source Selection Advisory Board's rational was adopted by the Source Selection Authority, who concluded that IAP offered the best value to the government, and selected IAP for award.

AFM initially filed a protest with the United States Government Accountability Office (GAO), Case No. B–401094.3, on February 10, 2009. The protest was withdrawn on May 14, 2009, based on the complaint filed in this court on May 13, 2009. However, defendant and the intervenor requested that an advisory opinion be obtained from the GAO. In this regard, the court was informed that briefing had already occurred at the GAO, and that a GAO decision on the same bid protest issues filed with this court was due within the week, by May 21, 2009. Therefore, in accordance with 4 C.F.R. § 21.11(b) (2009), the court requested an advisory opinion from the GAO, which was received on May 21, 2009.

## DISCUSSION

### Standard of Review

The Administrative Dispute Resolution Act of 1996 (ADRA), Pub.L. No. 104–320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996) (codified at 28 U.S.C. § 1491(b)(1)-(4) (2000)), amended the Tucker Act, providing the United States Court of Federal Claims with a statutory basis for bid protests. *See Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1330–32 (Fed. Cir.2001). The statute provides that protests of agency procurement decisions are to be reviewed under Administrative Procedure Act (APA) standards, making applicable the standards outlined in *Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859 (D.C.Cir.1970) and the line of cases following that decision. *See, e.g., Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1329 (Fed.Cir.) (citing *Scanwell* for its reasoning that "suits challenging the award process are in the public interest and disappointed bidders are the parties with an incentive to enforce the law."), *reh'g denied* (Fed.Cir.2004); *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed.Cir.2004) ("Under the APA standard as applied in the *Scanwell* line of cases, and now in ADRA cases, 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.' " (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d at 1332)); *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed.Cir), *reh'g and reh'g en banc denied* (Fed.Cir.2003).

Agency procurement actions should be set aside when they are "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (2)(D) (2000)[6]; *see also Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed.Cir.2009) (noting arbitrary and capricious standard set forth in 5 U.S.C. § 706(2)(A), and reaffirming the analysis of *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d at 1332); *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1312 (Fed.Cir.2007) ("[T]he inquiry is whether the [government's] procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A) (2000))); *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed.Cir.2005). In discussing the appropriate standard of review for bid protest cases, the United States Court of Appeals for the Federal Circuit specifically addressed subsections (2)(A) and (2)(D) of 5 U.S.C. § 706. *See Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d at 1332 n. 5; *see also NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed.Cir.2004) ("Bid protest actions are subject to the standard of review established under section 706 of title 5 of the Administrative Procedure Act ('APA'), 28 U.S.C. § 1491(b)(4) (2000), by which an agency's decision is to be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A) (2000).") (citations omitted); *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d at 1350 ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a

reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057–58 (Fed.Cir.), *reh'g denied* (Fed.Cir.2000))); *Info. Tech. & Applications Corp. v. United States*, 316 F.3d at 1319 ("Consequently, our inquiry is whether the Air Force's procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (2000).").

The United States Court of Appeals for the Federal Circuit has written that:

> Under the APA standards that are applied in the *Scanwell* line of cases, a bid award may be set aside if either: (1)[T]he procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.... When a challenge is brought on the first ground, the courts have recognized that contracting officers are "entitled to exercise discretion upon a broad range of issues confronting them" in the procurement process. *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir.1994). Accordingly, the test for reviewing courts is to determine whether "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion," *id.*, and the "disappointed bidder bears a 'heavy burden' of showing that the award decision 'had no rational basis.'" *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 456 (D.C.Cir. 1994). When a challenge is brought on the

---

6: The full language of section 706 of the APA provides:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
(1) compel agency action unlawfully withheld or unreasonably delayed; and
(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
(D) without observance of procedure required by law;
(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.
5 U.S.C. § 706.

second ground, the disappointed bidder must show "a clear and prejudicial violation of applicable statutes or regulations." *Kentron [Hawaii, Ltd. v. Warner,]* 480 F.2d [1166,] 1169 [ (D.C.Cir.1973) ]; *Latecoere,* 19 F.3d at 1356.

*Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d at 1332–33 (selected citations omitted); *see also Centech Group, Inc.v. United States,* 554 F.3d 1029, 1037 (Fed.Cir.2009) (reaffirming the analysis of *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d at 1332); *Banknote Corp. of Am. v. United States,* 365 F.3d at 1351; *OMV Med., Inc. v. United States,* 219 F.3d 1337, 1343 (Fed.Cir.2000).

▮ A disappointed bidder has the burden of demonstrating the arbitrary and capricious nature of the agency decision by a preponderance of the evidence. *See Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990, 995–96 (Fed.Cir.1996); *Textron, Inc. v. United States,* 74 Fed.Cl. 277, 285 (2006), *appeal dismissed sub nom. Textron, Inc. v. Ocean Technical Servs., Inc.,* 222 Fed.Appx. 996 (Fed.Cir.), 223 Fed.Appx. 974 (Fed.Cir.2007); *Labat–Anderson Inc. v. United States,* 50 Fed.Cl. 99, 106 (2001); *Emery Worldwide Airlines, Inc. v. United States,* 49 Fed.Cl. 211, 222, *aff'd,* 264 F.3d 1071 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir.2001); *Dynacs Eng'g Co. v. United States,* 48 Fed. Cl. 614, 619 (2001); *Ellsworth Assocs., Inc. v. United States,* 45 Fed.Cl. 388, 392 (1999), *appeal dismissed,* 6 Fed.Appx. 867 (Fed.Cir. 2001).

▮ The United States Supreme Court has identified sample grounds which can constitute arbitrary or capricious agency action:
> The agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *see also In re Sang Su Lee,* 277 F.3d 1338, 1342 (Fed.Cir.2002) ("The agency must present a full and reasoned explanation of its decision.... The reviewing court is thus enabled to perform a meaningful review...."), *aff'd on subsequent appeal,* 262 Fed.Appx. 275 (Fed.Cir.2008); *Textron, Inc. v. United States,* 74 Fed.Cl. at 285–86.

▮ Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. at 43, 103 S.Ct. 2856 ("The scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency."). "If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Honeywell, Inc. v. United States,* 870 F.2d 644, 648 (Fed.Cir.1989) (quoting *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir. 1971)); *see also Seaborn Health Care, Inc. v. United States,* 55 Fed.Cl. 520, 523 (2003) (quoting *Honeywell, Inc. v. United States,* 870 F.2d at 648 (quoting *M. Steinthal & Co. v. Seamans,* 455 F.2d at 1301)).

▮ As stated by the United States Supreme Court:
> Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (citations omitted); *see*

also *U.S. Postal Serv. v. Gregory,* 534 U.S. 1, 6–7, 122 S.Ct. 431, 151 L.Ed.2d 323 (2001); *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974), *reh'g denied,* 420 U.S. 956, 95 S.Ct. 1341, 43 L.Ed.2d 433 (1975); *Co–Steel Raritan, Inc. v. ITC,* 357 F.3d 1294, 1309 (Fed.Cir.2004) (In discussing the "arbitrary, capricious, and abuse of discretion otherwise not in accordance with the law" standard, the Federal Circuit stated that "the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); *In re Sang Su Lee,* 277 F.3d at 1342; *Advanced Data Concepts, Inc. v. United States,* 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." (citing *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. at 285, 95 S.Ct. 438)); *Lockheed Missiles & Space Co. v. Bentsen,* 4 F.3d 955, 959 (Fed.Cir.1993); *Gulf Group Inc. v. United States,* 61 Fed.Cl. 338, 351 (2004) ("Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); *ManTech Telecomms. & Info. Sys. Corp. v. United States,* 49 Fed.Cl. 57, 63 (2001), *aff'd,* 30 Fed.Appx. 995 (Fed.Cir. 2002); *Ellsworth Assocs., Inc. v. United States,* 45 Fed.Cl. at 392 ("Courts must give great deference to agency procurement decisions and will not lightly overturn them." (citing *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743–44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985))).

Similarly, in *E.W. Bliss Co. v. United States,* the United States Court of Appeals for the Federal Circuit offered guidance on the applicable standard of review:

> Procurement officials have substantial discretion to determine which proposal represents the best value for the government. *See Lockheed Missiles & Space Co., Inc. v. Bentsen,* 4 F.3d 955, 958 (Fed.Cir.1993); cf. *Widnall v. B3H,* 75 F.3d 1577 (Fed.Cir. 1996) (holding that Board of Contract Appeals should defer to agency's best value

decision as long as it is "grounded in reason ... even if the Board itself might have chosen a different bidder"); *In re General Offshore Corp.,* B–251969.5, B–251969.6, 94–1 Comptroller Gen.'s Procurement Decisions (Federal Publications Inc.) ¶ 248, at 3 (Apr. 8, 1994) ("In a negotiated procurement, any proposal that fails to conform to material terms and conditions of the solicitation should be considered unacceptable and may not form the basis for an award. Where an evaluation is challenged, we will examine the agency's evaluation to ensure that it was reasonable and consistent with the evaluation criteria and applicable statutes and regulations, since the relative merit of competing proposals is primarily a matter of administrative discretion.") (citations omitted).

\* \* \*

Bliss' [other challenges to the procurement] deal with the minutiae of the procurement process in such matters as technical ratings ... which involve discretionary determinations of procurement officials that a court will not second guess. *See Lockheed Missiles & Space Co.,* 4 F.3d at 958; *Grumman Data Systems Corp. v. Widnall,* 15 F.3d 1044, 1048 (Fed.Cir.1994) ("[S]mall errors made by the procuring agency are not sufficient grounds for rejecting an entire procurement."). . . .

*E.W. Bliss Co. v. United States,* 77 F.3d 445, 449 (Fed.Cir.1996); *see also Galen Med. Assocs., Inc. v. United States,* 74 Fed.Cl. 377, 383–84 (2006); *JWK Int'l Corp. v. United States,* 49 Fed.Cl. 371, 388 (2001), *aff'd,* 279 F.3d 985 (Fed.Cir.), *reh'g denied* (Fed.Cir. 2002).

In a negotiated procurement, contracting officers are generally afforded even greater decision making discretion, in comparison to their role in sealed bid procurements. "It is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the bidder or bidders that will provide the agency with the best value." *Banknote*

Corp. of Am. Inc. v. United States, 365 F.3d at 1355 (citing TRW, Inc. v. Unisys Corp., 98 F.3d 1325, 1327–28 (Fed.Cir.1996); E.W. Bliss Co. v. United States, 77 F.3d at 449; and Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958–59); see also Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330; Am. Tel. and Tel. Co. v. United States, 307 F.3d 1374, 1379 (Fed.Cir.2002), reh'g en banc denied (Fed.Cir.), cert. denied, 540 U.S. 937, 124 S.Ct. 56, 157 L.Ed.2d 249 (2003); Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958; Cybertech Group, Inc. v. United States, 48 Fed.Cl. 638, 646 (2001) ("The court recognizes that the agency possesses wide discretion in the application of procurement regulations."); Hayes Int'l Corp. v. United States, 7 Cl.Ct. 681, 686 (1985) ("It is well-established that contracting officials are accorded broad discretion in conducting a negotiated procurement...." (citing Sperry Flight Sys. v. United States, 212 Ct.Cl. 329, 339–40, 548 F.2d 915 (1977))). In Burroughs Corporation v. United States, the court described the broad discretion afforded a contracting officer in a negotiated procurement as follows:

Remarking on the contracting officer's discretion in negotiation, the court in Sperry Flight Systems Division v. United States, 212 Ct.Cl. 329, 339, 548 F.2d 915, 921 (1977) noted that "the decision to contract—a responsibility that rests with the contracting officer alone—is inherently a judgmental process which cannot accommodate itself to absolutes, at least not without severely impairing the quality of the judgment called for ..." and that, "effective contracting demands broad discretion." Because of the breadth of discretion given to the contracting officer in negotiated procurement, the burden of showing this discretion was abused, and that the action was "arbitrary and capricious" is certainly much heavier than it would be in a case of formal advertising.

Burroughs Corp. v. United States, 223 Ct.Cl. 53, 65, 617 F.2d 590, 598 (1980) (citation omitted; omissions in original); see also Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330; LaBarge Prods., Inc. v. West, 46 F.3d 1547, 1555 (Fed.Cir.1995); JWK Int'l Corp. v. United States, 49 Fed.Cl. at 388;

ManTech Telecomns. and Info. Sys. Corp. v. United States, 49 Fed.Cl. at 64.

The United States Court of Appeals for the Federal Circuit also has stated:

Effective contracting demands broad discretion. Burroughs Corp. v. United States, 223 Ct.Cl. 53, 617 F.2d 590, 598 (1980); Sperry Flight Sys. Div. v. United States, 548 F.2d 915, 921, 212 Ct.Cl. 329 (1977); see NKF Eng'g, Inc. v. United States, 805 F.2d 372, 377 (Fed.Cir.1986); Tidewater Management Servs., Inc. v. United States, 573 F.2d 65, 73, 216 Ct.Cl. 69 (1978); RADVA Corp. v. United States, 17 Cl.Ct. 812, 819 (1989), aff'd, 914 F.2d 271 (Fed.Cir.1990). Accordingly, agencies "are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government." Tidewater Management Servs., 573 F.2d at 73, 216 Ct.Cl. 69 ...

Lockheed Missiles & Space Co., Inc. v. Bentsen, 4 F.3d at 958–59; see also Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330; Grumman Data Sys. Corp. v. Dalton, 88 F.3d at 995; Grumman Data Sys. Corp. v. Widnall, 15 F.3d at 1046; PHT Supply Corp. v. United States, 71 Fed.Cl. 1, 11 (2006).

▮▮▮ Barring arbitrary and capricious behavior or a violation of law, the wide discretion afforded contracting officers extends to a broad range of procurement functions, including the determination of what constitutes an advantage over other proposals. See Compubahn, Inc. v. United States, 33 Fed.Cl. 677, 682–83 (1995) ("[T]his court is in no position to challenge the technical merit of any comments made on the evaluation sheets or decisions made during the several stages of evaluation.") (footnote omitted); see also Textron, Inc. v. United States, 74 Fed.Cl. at 286 (in which the court considered technical ranking decisions "minutiae of the procurement process" not to be second guessed by a court) (quoting E.W. Bliss Co. v. United States, 77 F.3d at 449). The question is not whether the court would reach the same conclusions as the agency regarding the comparison of proposals, but, rather, whether the conclusions reached by the agency lacked a

reasonable basis and, therefore, were arbitrary or capricious, in which case, courts have a role to review and instruct.

 To prevail in a bid protest case, the protester not only must show that the government's actions were arbitrary, capricious, or otherwise not in accordance with the law, but the protestor also must show that it was prejudiced by the government's actions. *See* 5 U.S.C. § 706 ("due account shall be taken of the rule of prejudicial error"). Recognizing the two-step analysis of bid protest cases, the Federal Circuit has stated that:

A bid protest proceeds in two steps. First ... the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second ... if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.

*Bannum, Inc. v. United States,* 404 F.3d at 1351. In describing the prejudice requirement, the United States Court of Appeals for the Federal Circuit has held that:

To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process. *See Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1581 (Fed.Cir.1996); *Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996). "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." *Data General,* 78 F.3d at 1562 (citation omitted). Rather, the protester must show "that there was a substantial chance it would have received the contract award but for that error." *Statistica,* 102 F.3d at 1582; *see CACI, Inc.–Fed. v. United States,* 719 F.2d 1567, 1574–75 (Fed.Cir.1983) (to establish competitive prejudice, protester must demonstrate that but for the alleged error, " 'there was a substantial chance that [it] would receive an award—that it was within the zone of active consideration.' ") (citation omitted).

*Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (Fed.Cir.), *reh'g denied* (Fed.Cir.1999) (citation omitted in original); *see also Galen Med. Assocs., Inc. v. United States,* 369 F.3d at 1331; *Info. Tech. & Applications Corp. v. United States,* 316 F.3d at 1319; *Myers Investigative & Sec. Servs., Inc. v. United States,* 275 F.3d 1366, 1370 (Fed. Cir.2002); *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d at 1332–33; *OMV Med., Inc. v. United States,* 219 F.3d at 1342; *Advanced Data Concepts, Inc. v. United States,* 216 F.3d at 1057; *Stratos Mobile Networks USA, LLC v. United States,* 213 F.3d 1375, 1380 (Fed.Cir.2000).

In *Data General Corporation v. Johnson,* the United States Court of Appeals for the Federal Circuit wrote:

We think that the appropriate standard is that, to establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract.... The standard reflects a reasonable balance between the importance of (1) averting unwarranted interruptions of and interferences with the procurement process and (2) ensuring that protesters who have been adversely affected by allegedly significant error in the procurement process have a forum available to vent their grievances.

This is a refinement and clarification of the "substantial chance" language of *CACI, Inc.–Fed.,* 719 F.2d at 1574.

*Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.), *reh'g denied, en banc suggestion declined* (Fed.Cir.1996); *see also Bannum, Inc. v. United States,* 404 F.3d at 1353, 1358 ("The trial court was required to determine whether these errors in the procurement process significantly prejudiced Bannum.... To establish 'significant prejudice' Bannum must show that there was a 'substantial chance' it would have received the contract award but for the [government's] errors" in the bid process) (quoting *Info. Tech. & Applications Corp. v. United States,* 316 F.3d at 1319; *Alfa Laval Separation, Inc. v. United States,* 175 F.3d at 1367; *Statistica, Inc. v. Christopher,* 102 F.3d at 1581;

and *Data Gen. Corp. v. Johnson,* 78 F.3d at 1562)); *see also Galen Med. Assocs., Inc. v. United States,* 369 F.3d at 1331 ("To establish prejudice, the claimant must show that there was a 'substantial chance it would have received the contract award but for that error.'" (quoting *Statistica, Inc. v. Christopher,* 102 F.3d at 1582); *Myers Investigative & Sec. Servs., Inc. v. United States,* 275 F.3d at 1370 (using the "substantial chance" standard); *OMV Med., Inc. v. United States,* 219 F.3d at 1342 (invoking a "reasonable likelihood" of being awarded the contract test); *Advanced Data Concepts, Inc. v. United States,* 216 F.3d at 1057 (using a "reasonable likelihood" rule); *Stratos Mobile Networks USA, LLC v. United States,* 213 F.3d at 1380 (using a "substantial chance" test); *Info. Scis. Corp. v. United States,* 73 Fed.Cl. 70, 96 (2006) (using a "substantial chance" test), *recons. in part,* 75 Fed.Cl. 406, 412 (2007) (using a "substantial chance" test); *Park Tower Mgmt., Ltd. v. United States,* 67 Fed. Cl. 548, 559 (2005) (using a "substantial chance" test).

Plaintiff brings seven issues before the court, concerned with price (Counts I–V) and technical evaluation (Counts VI and VII). Plaintiff withdrew Count VIII of the complaint, concerning an alleged unfair competitive advantage. The court, therefore, dismisses Count VIII.

■ In Count I, plaintiff alleges that: the Navy conducted unequal discussions in violation of Federal Acquisition Regulation (FAR) 15.306. The cited FAR 15.306 is titled "Exchanges with offerors after receipt of proposals," and FAR 15.306(e) is titled "Limits on exchanges." FAR 15.306(e) states: "Government personnel involved in the acquisition shall not engage in conduct that—(1) Favors one offeror over another[.]" 48 C.F.R. § 15.306(e) (2008). *See, e.g., Metcalf Constr. Co. v. United States,* 53 Fed.Cl. 617, 633–35 (2002) (applying FAR 15.306(e)(1), in which the court found that bidders were treated unequally during discussions when one bidder was advised by the agency not to exceed the budget ceilings, and a second bidder was not similarly advised); *see also Gentex Corp. v. United States,* 58 Fed.Cl. 634, 653 (2003).

Plaintiff argues that the Navy, through the use of the terms "overstated" and "significantly overstated" as to line items compared to the Independent Government Estimate (IGE), gave more information to IAP during discussions than it did to plaintiff, which permitted IAP to lower its bid price and win award. Plaintiff highlights the price proposal discussion questions to the offerors. For IAP's proposal, six of IAP's fixed price line items were characterized by the Navy as "significantly overstated," compared to the Independent Government Estimate (IGE). Plaintiff cites the example of line item [deleted] for [deleted]. IAP's initial proposal was [deleted] for this line item. The IGE for the line item was [deleted]. IAP's bid for the line item, therefore, was 39.88% higher than the IGE, eliciting from the Navy the "significantly overstated" comment. IAP then reduced its price for the [deleted] line item to [deleted] in its final proposal revision, which is 28.90% below the IGE. Plaintiff estimates that IAP reduced its prices by an average of 60.73% for line items characterized by the Navy during discussions as "significantly overstated," but only reduced the "overstated" line items by 39.37%. By way of comparison, plaintiff identifies 25 line items in its own proposal which were more than 39.88% over the IGE, but were merely characterized by the Navy as "overstated," and not "significantly overstated." Plaintiff, therefore, complains of unequal discussions. Plaintiff argues that if it had been treated equally during discussions, and also told some of its proposal numbers were significantly overstated, it would have made more major reductions in its pricing.

However, rather than, either intentionally or inadvertently, providing signals only to IAP to permit IAP to lower its pricing and win award, the "significantly overstated" characterization appears to reflect the Navy's concern that, for certain line items, IAP's price proposal was "unbalanced." FAR 15.404–1 ties the phrase "significantly overstated" to unbalanced pricing:

> Unbalanced pricing may increase performance risk and could result in payment of unreasonably high prices. Unbalanced pricing exists when, despite an acceptable total evaluated price, the price of one or

more contract line items is *significantly over or understated* as indicated by the application of cost or price analysis techniques.

48 C.F.R. § 15.404–1(g)(1) (emphasis added).

That the Navy was addressing its concern about unbalanced pricing in IAP's pricing proposal is indicated in the following September 8, 2008, Price Evaluation Board Report:

(a) Within SLIN [subline item number] [deleted], the pricing of several of the Contractor's ELINs [exhibit line item numbers], appear to be *unbalanced.* Specifically, proposed pricing for [deleted] appears to be *significantly overstated* compared to the Government Estimate and proposed prices for [deleted] appear *significantly understated.*

(b) Within the [deleted], it appears that proposed [deleted] prices are *unbalanced.* Specifically, [deleted] prices for [deleted] appear *significantly overstated* compared to the Government Estimate. Conversely, the [deleted] prices for [deleted] appear to be *significantly understated* compared to the Government Estimate.

(emphasis and brackets added).

The Source Selection Authority for this procurement, Cindy Readal, in an affidavit dated May 6, 2009, submitted first to the GAO, confirms that, "where the agency informed IAP that its prices were 'significantly overstated' it did so because IAP's prices for certain ELINS appeared to be unbalanced or reversed," in contrast with AFM's prices, and not because IAP's prices exceeded the Independent Government Estimate by a certain percentage. In fact, IAP did re-balance, or re-allocate costs among line items, as reflected in IAP's responses to discussion questions raising the balancing issue.

 Plaintiff objects to the Source Selection Authority's affidavit, quoting the United States Supreme Court in the *Florida Power & Light Company* case:

If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action of the basis of the record before it, the proper

course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.

*Florida Power & Light Co. v. Lorion,* 470 U.S. at 744, 105 S.Ct. 1598. However, *Florida Power & Light* does not stand for the proposition that the record can never be supplemented. Plaintiff also relies on the recent United States Court of Appeals for the Federal Circuit case of *Axiom Resource Management, Inc. v. United States,* 564 F.3d 1374, which both cites to *Florida Power & Light,* and provides the following test for supplementing the administrative record:

The focus of judicial review of agency action remains the administrative record, which should be supplemented only if the existing record is *insufficient to permit meaningful review consistent with the APA.* Faced with the request to supplement the administrative record in this case, the Court of Federal Claims should have determined whether supplementation of the record *was necessary in order not "to frustrate effective judicial review."*

*Axiom Res. Mgmt., Inc. v. United States,* 564 F.3d at 1381 (quoting *Camp v. Pitts,* 411 U.S. 138, 142–43, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973)) (emphasis added). In the same case, the Federal Circuit also characterized the test as: "supplementation of the record should be limited to cases in which 'the omission of extra-record evidence precludes effective judicial review.'" *Axiom Res. Mgmt., Inc. v. United States,* 564 F.3d at 1380 (quoting *Murakami v. United States,* 46 Fed.Cl. 731, 735 (2000), *aff'd,* 398 F.3d 1342 (Fed.Cir. 2005)).

The court in *Holloway & Co. v. United States,* 87 Fed.Cl. 381, ——–——, 2009 WL 1351413, at *9–10 (2009), acknowledged the *Axiom* case, but noted that the documents at issue in *Holloway* were part of the GAO record in the GAO protest filed before the same protest was brought to the Court of Federal Claims. Similarly, plaintiff in the present case challenges an affidavit which was part of the GAO record in a GAO protest filed before the same protest was brought to this court. The court in *Holloway* noted that RCFC Appendix C, "Procedure in Procurement Protest Cases Pursuant to 28 U.S.C.

§ 1491(b)," paragraph 22(u), states that, "The core documents relevant to a protest case may include, as appropriate, the record of any previous administrative or judicial proceedings relating to the procurement, including the record of any other protest of the procurement." Under this rule, the court in *Holloway* admitted the documents from the earlier GAO protest record in the proceedings before the Court of Federal Claims. *Holloway & Co. v. United States*, 87 Fed.Cl. at 391–93, 2009 WL 1351413, at *9–10.

Under the *Holloway* reasoning, the affidavit of the Source Selection Authority, which was part of the agency report for the bid protest at GAO, would be admitted for the same party, bid protest before this court. Furthermore, confirming the Navy's intention with respect to use of the phrase "significantly overstated," in the discretion of the trial court, is necessary to ensure "meaningful" and "effective" judicial review by this court. It is this court's responsibility to decide cases for the right reasons and to ensure that the position of both parties is fully understood in order not to "frustrate effective judicial review." Was the Navy using the phrase for line items that exceeded the IGE by certain percentages, or was the Navy using the phrase as part of its concern for unbalanced pricing, an issue with IAP's proposal, but not with that of the plaintiff? The record without the affidavit does not explicitly reflect the answer to this question. Without the affidavit, the answer to the question would remain speculative. Furthermore, if, for example, the Source Selection Authority had stated that unbalancing had nothing to do with use of the phrase, "significantly overstated," that might result in a different analysis, and perhaps lead to a different result on this critical issue. Therefore, omission of the Source Selection Authority's affidavit would result in less effective judicial review, *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d at 1380–81.

Plaintiff focuses only on the phrase, "significantly overstated," but noting the companion references to "unbalanced" pricing and "significantly understated" line items, and the Source Selection Authority's affidavit, the Navy's comments during discussions

are placed in context. The language in question appears to be an attempt to tailor discussions to the Navy's concern that, on a number of line items, IAP may have had unbalanced pricing, warranting review and correction as needed. As such, use of the phrasing by the Navy was reasonable. *See* 48 C.F.R. § 15.306(d)(1) ("Discussions are tailored to each offeror's proposal, and must be conducted by the contracting officer with each offeror within the competitive range."); *World Travel Serv. v. United States*, 49 Fed. Cl. 431, 439 (2001) ("[T]he agency should tailor its discussions to each offer, since the need for clarifications or revisions will vary with the proposals. Ultimately, both the decision to conduct discussions and the scope of any discussions are left to the judgment of the contracting officer.") (citations omitted).

The GAO advisory opinion on the same Academy Facilities Management protest also agrees with the government explanation for its choice of language during discussions:

> The record reflects that it was the Navy's belief that prices were unbalanced, rather than the size of the price discrepancy, that determined the choice of discussion wording employed. For example, while the agency identified IAP [deleted] as apparently unbalanced and "significantly overstated," the price discrepancy from the IGE was 39.88 percent. By contrast, all (ten) IAP ELINs that the Navy identified as "overstated," but not unbalanced, had price discrepancies greater than 39.88 percent (and as high as 1,343.73 percent) from the IGE. The record also shows that where the Navy informed IAP of ELINs that appeared to be "significantly overstated," the discussions simultaneously informed the offeror of other ELINs that appeared to be "significantly understated." In comparison, the PEP [Price Evaluation Panel] did not find any individual AFB ELINs to be unbalanced, and the agency's discussions did not identify any AFM ELINs as "significantly overstated" regardless of the price discrepancy from the IGE.

\* \* \*

In our view, AFM's argument is mistakenly premised upon an improper "apples-to-

oranges" comparison. In performing its evaluation of IAP's price, the agency identified various ELINs as apparently unbalanced, and its subsequent discussions with IAP utilized the wording "significantly overstated" only in those instances deemed to be unbalanced (irrespective of the degree of price discrepancy from the IGE). By contrast, in performing its evaluation of AFM's price, the Navy did not find any ELINs to be unbalanced, and thus, its discussions with the offeror did not identify any ELINs as "significantly overstated" (again, irrespective of the degree of price discrepancy from the IGE). In sum, the difference in the Navy's discussion with IAP and AFM was not the result of unequal treatment by the agency, but instead resulted from the agency's recognition of different underlying facts. We also see no merit to the protester's argument that the discussions, as phrased, were not meaningful; AFM received discussions properly tailored to its proposal, with specific notice of the individual areas which the Navy believed were of concern. The Navy's decision to identify certain individual AFM ELINs as "overstated," as opposed to "significantly overstated," did not, we think, fail to impart sufficient information to afford the offeror a fair and reasonable opportunity to identify and correct deficiencies, excesses, or mistakes in its proposal. *Academy Facilities Management*, B-401094.3, Advisory Opinion, at 8–9 (Comp. Gen. May 21, 2009) (footnotes and citations omitted).

In Count II, the plaintiff alleges that: price discussions were not meaningful and were affirmatively misleading, in violation of FAR 15.306(d), because they were based entirely on a flawed Independent Government Estimate. The cited FAR 15.306(d) is titled, "Exchanges with offerors after establishment of the competitive range." The FAR states:

Negotiations are exchanges, in either a competitive or sole source environment, between the Government and offerors, that are undertaken with the intent of allowing the offeror to revise its proposal. These negotiations may include bargaining. Bargaining includes persuasion, alteration of assumptions and positions, give-and-take, and may apply to price, schedule, technical requirements, type of contract, or other terms of a proposed contract. When negotiations are conducted in a competitive acquisition, they take place after establishment of the competitive range and are called discussions.[7]

48 C.F.R. § 15.306(d) (2008).

The discussions, which occur in a procurement, including in the present case, must be meaningful, a concept drawn from the following FAR language:

At a minimum, the contracting officer must, subject to paragraphs (d)(5) and (e) of this section and 15.307(a), indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond. The contracting officer also is encouraged to discuss other aspects of the offeror's proposal that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award. However, the contracting officer is not required to discuss every area where the proposal could be improved. The scope and extent of discussions are a matter of contracting officer judgment.

48 C.F.R. § 15.306(d)(3); *see also Advanced Data Concepts, Inc. v. United States*, 43 Fed. Cl. 410, 422–23 (1999) (noting that the contracting officer has broad discretion in conducting discussions, citing *Burroughs Corp. v. United States*, 223 Ct.Cl. 53, 617 F.2d 590, 598 (1980)), *aff'd*, 216 F.3d 1054 (Fed.Cir.), *reh'g denied* (Fed.Cir.2000); *Carahsoft Tech. Corp. v. United States*, 86 Fed.Cl. 325, 343 (2009) ("[A]n agency is not required to 'spoon-feed' offerors in order to have meaningful discussions. While meaningful discus-

---

7. " 'Discussions' are negotiations that occur after establishment of the competitive range that may, at the Contracting Officer's discretion, result in the offeror being allowed to revise its proposal."

Federal Acquisition Regulation (FAR) clause 52.215–1(a) (Definitions), "Instructions to Offerors—Competitive Acquisition (JAN 2004)."

sions should be as specific as practical considerations permit, they do not require the agency to identify 'each and every item that could be raised as [sic] to improve its proposal.'" (quoting *Dynacs Eng'g Co. v. United States,* 48 Fed.Cl. 124, 131 (2000))) (other citations omitted). Analogous to the discussions of understated and overstated line items prices compared to the Independent Government Estimate in the present case, the court in *Fort Carson Support Services* addressed understaffing and overstaffing against a Most Probable Cost figure. The staffing was raised during discussions, but the protester complained that understaffing should have been more precisely spelled out. The court concluded, however, that the protester "'was placed on notice of significant identified management problems. That renders the discussions meaningful under the FAR.'" *Fort Carson Support Servs. v. United States,* 71 Fed.Cl. 571, 603 (2006) (quoting *Cubic Def. Sys., Inc. v. United States,* 45 Fed.Cl. 450, 471 (1999)) (internal quotation omitted in original). Continuing, the court in *Fort Carson Support Services* held that: "The Army specifically identified areas of understaffing and conveyed the seriousness of the issue, satisfying its obligation under the FAR, as it was 'not required to recommend a particular level of staffing.'" *Fort Carson Support Servs. v. United States,* 71 Fed.Cl. at 603 (quoting *World Travel Serv. v. United States,* 49 Fed.Cl. at 440) (internal quotation omitted in original). In *Fort Carson Support Services,* staffing was a subject of discussions, but an underlying issue on extended staffing hours was not. Nevertheless, the discussion of staffing "sufficed to 'generally lead' FCSS [the protester] 'into the areas of [its] proposal [ ] requiring amplification or correction.' Moreover, the FAR provision requires a discussion of 'significant weaknesses,' not all weaknesses. 48 C.F.R. § 15.306(d)(3) (2005)." *Fort Carson Support Servs. v. United States,* 71 Fed.Cl. at 604 (quoting *World Travel Serv. v. United States,* 49 Fed.Cl. at 439) (initial brackets added).

█ The court in the *World Travel Service* case, cited above, summarized the rules on meaningful discussions:

"Agencies need not discuss every aspect of the proposal that receives less than the maximum score or identify relative weaknesses in a proposal that is technically acceptable but presents a less desirable approach than others." *Development Alternatives, Inc.,* Comp. Gen. B–279920, Aug. 6, 1998, 98–2 CPD ¶ 54, at 7, 1998 WL 546017. Rather, the agency should tailor its discussions to each offer, since the need for clarifications or revisions will vary with the proposals. Ultimately, both the decision to conduct discussions and the scope of any discussions are left to the judgment of the contracting officer.

\* \* \*

In these circumstances, while WTS [the protester] may believe that it should have been given better guidance, it certainly cannot claim that it did not understand the need to reduce its price. The comment [during discussions] plainly led WTS "into the areas of [its] proposal ... requiring amplification or correction." *SDS Int'l v. United States,* 48 Fed.Cl. 759, 773 (2001). Moreover, WTS's contention that NIH [National Institutes of Health] was obligated under the FAR to give it more specific instructions regarding price cuts it could have made to compete more effectively against Omega [the awardee] is not supported. Agencies are not obligated to provide the type of specific guidance WTS claims is required by the FAR. In *LaBarge Electronics,* Comp. Gen. B–266210, Feb. 9, 1996, 96–1 CPD ¶ 58, 1996 WL 53930, the GAO explained that the government is not obligated to advise an offeror where its prices could be reduced. "[W]hile agencies generally are required to conduct meaningful discussions by leading the offerors into the areas of their proposals requiring amplification, this does not mean that an agency must 'spoon-feed' an offeror as to each and every item that must be revised, added, or otherwise addressed to improve a proposal." *Id.* at 6. *See also SDS Int'l,* 48 Fed.Cl. at 774 (the government is not required to "recommend a particular level of staffing," where the agency's discussions related to staffing and where the final offer responded to discus-

sions). Where, as here, the agency's admonition led WTS to make a significant price adjustment in its final bid proposal, the court cannot say that NIH violated its procurement obligations.

*World Travel Serv. v. United States,* 49 Fed. Cl. at 439 (other citations omitted, brackets added, and omissions in original). The record demonstrates that the defendant reviewed each of the proposals and, as is appropriate, identified individual issues based on the separate proposals for discussion with each offeror, including the plaintiff.

■ Plaintiff, however, characterizes discussions in the present case as not meaningful, and also misleading, in that the Navy "based price discussions solely on the extent to which each offeror's proposed line item prices deviated from the line item prices in the IGE [Independent Government Estimate]," and that the IGE was flawed. Plaintiff has various complaints about the IGE, such as, its origins. However, the September 8, 2008, Price Evaluation Board Report, which plaintiff attached to its complaint, addresses the origins of the IGE: "The IGE is based upon standard estimating guides, which include the NAVFAC Engineering Performance Standards, RS Means estimating guides, historical data (previously proposed prices) and independent material prices." As the incumbent on the Base Operating Support contract, plaintiff, no doubt, understood, better than others, much of the historical pricing from which the IGE was derived. Moreover, plaintiff has not demonstrated that the IGE, in fact, was flawed.

Plaintiff also labeled the IGE as an "ineffective tool for evaluating proposals." Plaintiff complains that the government compared individual line items in price proposals to the IGE, but then ignored the data from this approach and based the final award on offeror's total prices. The record reflects that the IGE was used throughout the evaluation process. The September 8, 2008 Price Evaluation Board Report "found large variances in pricing among the offers submitted and many individual ELINS appeared either understated or overstated when compared to the IGE." Such variances, however, do not lead to the conclusion that the IGE was ineffective. Variances from the IGE were shared with offerors during discussions, with the request to "review the pricing, adjust your pricing if deemed necessary, and provide a detailed rationale to support your proposed prices with an explanation of your pricing methodology." As a result of this process, with the Navy employing the IGE, each offeror adjusted its prices and provided rationale to support their new price proposal. The decision of how to adjust a particular price proposal after the discussions rested with the offeror. Overall prices were compared to the IGE throughout the evaluation process, as reflected in the December 16, 2008 Price Evaluation Panel Report following discussions and final proposal revisions.

In its complaint, plaintiff cites the example of FFP [firm fixed price] line item [deleted]. The IGE for this line item was [deleted]. Plaintiff initially proposed [deleted] for the line item. The Navy indicated that the price for [deleted] was "significantly understated," and plaintiff increased its price for the item to [deleted], which was very close to the IGE of [deleted]. Plaintiff argues that, "Although AFM's revised price hit the IGE dead on, the Navy turned around and accepted, without any further comparison to the IGE estimate for this line item, a final IAP price of [deleted], which was still over 33% less than the IGE." Plaintiff's narrative of the [deleted] line item, however, is incomplete. IAP's initial pricing for the same [deleted] was [deleted], compared to plaintiff's initial price of [deleted] for that line item. *Both* offerors were told that their figures "appear significantly understated compared to the Government Estimate." In response, plaintiff chose to raise its price for [deleted] to [deleted], and IAP chose to raise its price to [deleted]. Both offerors were informed by the Navy to "[p]lease review the pricing, adjust your pricing if deemed necessary, and provide a detailed rationale to support your proposed prices with an explanation of your pricing methodology." As noted, the decision on at what level to price [deleted] was the offerors' decision, not the Navy's. The parties appear to have been treated the same in the discussion and evaluation process. The pricing differences stemmed from different business decisions by plaintiff and IAP.

Furthermore, the Navy did not rely exclusively on a comparison of offerors' prices with the IGE. The September 8, 2008, Price Evaluation Board Report indicated that the analysis of offerors' prices was based on a "comparison of the individual proposed prices, comparison of previously proposed prices and previous Government contract prices with current proposed prices, and comparison of individual proposals with the Independent Government Estimate[.]" The Navy, thus, compared the prices of the five original offerors; considered earlier prices on the Base Operating Support contract, which was not a new effort, but had pricing history, as well as compared current offerors' prices with the IGE. Using the IGE as a point of comparison during the discussion and evaluation process did not preclude the Navy from awarding to IAP at a price below the IGE in a best value solicitation. In *Biospherics, Inc. v. United States,* 48 Fed.Cl. 1 (2000), for example, the agency used an Independent Government Cost Estimate (IGCE) as a point of comparison with CLINs (contract line item numbers), while award was made on final, total evaluated prices. The agency had discussions with the offerors on CLINs that were above and below the IGCE. *Id.* at 12. At the conclusion of discussions, the agency analyzed final proposals by comparing total prices. *Id.* at 10. The court in *Biospherics* concluded that the agency's procurement decision was not unreasonable. *Id.* at 14. Similarly, the court finds the Navy's approach in the present case to be based on a thoughtful and reasonable analysis.

Plaintiff cites the GAO case of *Ranor, Inc.*, in support of Count II. In *Ranor, Inc.*, the government repeatedly advised the protester and another offeror that their prices were too low, whereupon Ranor and the other offeror significantly increased their prices. *Ranor, Inc.*, B–255904, 94–1 CPD ¶ 258, 1994 WL 130018, at *1–2 (Comp.Gen. Apr. 14, 1994) In its Best and Final Offer (BAFO), Ranor more than doubled its earlier price. *Id.* at *2. In contrast, the awardee in *Ranor, Inc.* dramatically reduced its price for its BAFO, becoming the low offeror. *Id.* The awardee's price approximated the original prices of Ranor and the other offeror, which earlier had been deemed low by the government, compared to the government estimate, but apparently not too low for award after BAFOs. *Id.* The present case is distinguishable from *Ranor.* In the present case, both plaintiff and IAP were advised by the Navy regarding items as to which their prices were high or low compared to the IGE. Awardee IAP initially proposed [deleted], and after discussions and the request for final price revisions, added [deleted] to its initial bid, for a final price proposal of [deleted]. The awardee in *Ranor* started high, and dramatically reduced its BAFO to have the low bid. IAP did no such thing. IAP was always lower in price than plaintiff. IAP increased its bid by [deleted], which is [deleted] than plaintiff increased its bid. Plaintiff's initial price was [deleted]. Plaintiff's final price was [deleted], reflecting an increase of [deleted]. Both offerors were low compared to the [deleted] IGE, and once this was pointed out by the Navy, both increased their offers. Unlike *Ranor*, IAP had the low price initially, and also the low price on final proposals. Due to the different facts, the GAO case of *Ranor* does not assist plaintiff.

The GAO advisory opinion also addressed the very protest grounds raised by plaintiff. In its advisory opinion on AFM's protest initially before it, the GAO concluded that price discussions under the present facts were meaningful.

> We see nothing misleading or coercive regarding the discussions about which AFM complains. The Navy's initial price evaluation found that, in certain instances, AFM's prices appeared understated in comparison to the IGE. The agency's discussions with AFM accurately conveyed the identified weakness and simply provided the offeror with the opportunity to review—and if deemed necessary, revise—its prices. AFM's decision to revise certain prices upward or downward reflects the exercise of the firm's own business judgment, not improper conduct by the agency.

*Academy Facilities Management,* B–401094.3, Advisory Opinion, at 6 (Comp.Gen. May 21, 2009) (citations omitted).

 In Count III, the plaintiff alleges that: price discussions were further misleading in violation of FAR 15.306(d), because the Navy failed to identify all instances in which plaintiff's proposal was materially higher than the Independent Government Estimate. As in Count II, plaintiff relies on the FAR 15.306(d)(3) requirement for agencies to conduct meaningful, and not misleading, discussions with offerors. Plaintiff's complaint states that 31 line items of plaintiff's proposal were identified by the Navy during discussions as materially higher than the Independent Government Estimate, whereas, there were at least eight additional line items in plaintiff's proposal which were more than 20% above the IGE that were not identified. However, plaintiff's standard of "more than 20% above the IGE" is not contained in the solicitation. Plaintiffs' eight items are against a backdrop of over 800 individually priced exhibit items in this procurement, including base and option years. FAR 15.306(d)(3) reasonably provides that "the contracting officer is not required to discuss every area for which the proposal could be improved. The scope and extent of discussions are a matter of contracting officer judgment." Furthermore, reviewing the same discussion questions cited by plaintiff, in addition to the 31 line items in plaintiff's proposal cited by the Navy during discussions as overstated, the court counts another 18 items in plaintiff's proposal cited by the Navy as understated, and another three matters not cited as overstated or understated, but identified as warranting closer review by plaintiff. Although plaintiff complains about the extent of the Navy evaluation, this broader picture suggests employment of a reasonable discussion process. Nor was plaintiff treated differently from IAP. Plaintiff acknowledges that not all of IAP's overstatements were brought to IAP's attention by the Navy either. In any event, case law does not require the level of detail the plaintiff suggests in order for there to have been meaningful discussions. *See Carahsoft Tech. Corp. v. United States,* 86 Fed.Cl. at 343 ("[A]n agency is not required to 'spoon-feed' offerors in order to have meaningful discussions. While meaningful discussions should be as specific as practical considerations permit, they do not require the agency to identify 'each and every item that could be raised as [sic] to improve its proposal.'" (quoting *Dynacs Eng'g Co. v. United States,* 48 Fed.Cl. 124, 131 (2000))) (other citations omitted); *World Travel Serv. v. United States,* 49 Fed.Cl. at 439 ("'[W]hile agencies generally are required to conduct meaningful discussions by leading the offerors into the areas of their proposals requiring amplification, this does not mean that an agency must "spoon-feed" an offeror as to each and every item that must be revised, added, or otherwise addressed to improve a proposal.'" (quoting *LaBarge Electronics,* Comp. Gen. B–266210, Feb. 9, 1996, 96–1 CPD ¶ 58, 1996 WL 53930 at 6)).

Plaintiff cites to the GAP case of *Multimax, Inc.,* in support of Count III. In *Multimax,* the agency mechanistically applied a complex formula involving a two standard deviation measure to identify proposed labor rates which were questionable. *Multimax, Inc.,* B–298249.6, 2006 CPD ¶ 165, 2006 WL 3300346, at *6–7 (Comp.Gen. Oct. 24, 2006). However, the two standard deviation formula allowed a "broad range" of rates which "reasonably should have been considered significantly overstated," and brought to the attention of offerors during discussions. *Id.* at *9. The formula failed to identify "numerous" proposed rates that were significantly overstated, and actually identified very "few" such rates, according to the GAO opinion. *Id.* at *8. Unlike *Multimax,* in the present case, no two standard deviation type formula was in the solicitation; and during discussions numerous overstated and understated prices were identified and brought to the attention of offerors. *Multimax* is distinguishable from the present case, and does not assist plaintiff.

The court also agrees with the GAO's practical analysis in its advisory opinion on this protest, which focuses on prejudice, with the conclusion that, even if plaintiff's eight additional overstated line items had been identified and brought to plaintiff's attention during discussions, plaintiff cannot demonstrate that it had a substantial chance of receiving the award.

As the protester itself points out, even assuming that AFM had reduced its original prices for the eight ELINs in question by 33.94 percent (the figure which AFM states was its average price reduction when informed that its prices were overstated), the total additional reduction in AFM's final price would only have been [deleted]. Further, even assuming that AFM had reduced its final prices to $0 for the ELINs in question, the total reduction in AFM's final price would only have been [deleted]. By contrast, there was a [deleted] difference between the IAP and AFM proposals. Accordingly, we see no basis to conclude that the offerors' competitive positions would have changed; IAP's proposal would remain both higher technically-rated and lower-priced than AFM's.

*Academy Facilities Management*, B–401094.3, Advisory Opinion, at 10 (Comp.Gen. May 21, 2009) (citations and footnote omitted).

Before this court, plaintiff has sharpened its pencil and projected beyond the GAO's above [deleted] figure, suggesting in this court that it might have reduced its pricing another [deleted] had the Navy used the phrase "significantly overstated" more liberally; that perhaps another [deleted] could have been shaved from its pricing had the Navy added *all* overstated line items compared to the IGE, to the discussions with plaintiff; and reduced its bid yet another [deleted], based on what plaintiff has termed the improper "Wild Goose Chase," a colorful name for the allegedly improper discussions conducted by the Navy with the offerors in the competitive range, but which may more properly describe plaintiff's speculative computations. The grand total of plaintiff's crystal ball gazing is a reduction of [deleted], comfortably above the [deleted] difference in the final price proposals of awardee IAP and plaintiff. The line items in plaintiff's analysis are overlapping, the assumptions unsupported, the figures "cherry-picked" for maximum impact, and the result both confusing and highly speculative. Plaintiff had a higher priced proposal compared to IAP before discussions, and after discussions, although the maligned, by plaintiff, discussion process enabled plaintiff to close the gap between the two price proposals, from [deleted] higher than IAP before discussions to [deleted] higher than IAP after discussions. Plaintiff appears to be arguing for an entitlement to a roadmap from the Navy, with a level of detail, direction and coaching to effectively remove an offeror's business judgment from the process. But both IAP and plaintiff acknowledged during oral argument that prices were adjusted, raised and lowered by each offeror, for line items identified and discussed by the Navy and also for those not identified and discussed by the Navy. The Navy properly did not direct what prices the parties should submit, for pricing is ultimately a business decision of offerors. The court finds plaintiff's computations unconvincing. Moreover, the court has not found error on the part of the Navy in the evaluation, discussion and award process.

■ In Count IV, the plaintiff alleges that: the Navy failed to resolve its identified concerns that IAP's price proposal was unbalanced, in violation of FAR 15.404–1(g). The FAR describes the concern about unbalanced pricing:

> Unbalanced pricing may increase performance risk and could result in payment of unreasonably high prices. Unbalanced pricing exists when, despite an acceptable total evaluated price, the price of one or more contract line items is significantly over or understated as indicated by the application of cost or price analysis techniques.

48 C.F.R. § 15.404–1(g)(1). The Navy raised the matter of unbalanced pricing during discussions of IAP's price proposal. For example, the September 8, 2008 Price Evaluation Board Report stated that: "Your [IAP's] overall [deleted] price and most of your [deleted] Unit Prices appear significantly understated in comparison to the Government estimate and may cause your proposal to be considered unbalanced."

In this regard, the FAR provides that:

(2) All offers with separately priced line items or subline items shall be analyzed to determine if the prices are unbalanced. If cost or price analysis techniques indicate

that an offer is unbalanced, the contracting officer shall—

(i) Consider the risks to the Government associated with the unbalanced pricing in determining the competitive range and in making the source selection decision; and

(ii) Consider whether award of the contract will result in paying unreasonably high prices for contract performance.

(3) An offer may be rejected if the contracting officer determines that the lack of balance poses an unacceptable risk to the Government.

48 C.F.R. § 15.404–1(g)(2), (3). Plaintiff charges that the Navy did not perform an analysis of IAP's revised prices on a line item by line item basis, and did not conduct an analysis of the risks to the Navy associated with its concerns about unbalanced pricing. The court concludes otherwise.

On September 8, 2008, discussion questions were issued to the three offerors in the competitive range, including IAP and plaintiff. The December 16, 2008, Price Evaluation Panel Report indicated that "[m]any of the discussion questions centered around the issue of whether the offerors [sic] price proposal [sic] were balanced between the FFP and IDIQ portions." After raising whether IAP's proposal was unbalanced in its September 8, 2008, list of discussion questions, and identifying areas that required discussion in IAP's price proposal, the Navy continued: "Please review the pricing, adjust your pricing if deemed necessary, and provide a detailed rationale to support your proposed prices with an explanation of your pricing methodology." IAP addressed the price proposal discussion questions, adjusting, balancing and justifying its pricing, line item by line item. As counsel for IAP notes in his brief:

> IAP provided detailed responses to those [discussion] questions, making adjustments where necessary to align the ELINs' balance in accordance with the Navy's expectations. For example, IAP's discussion responses confirm that one reason for variations between IAP's prices and the IGE was a labeling problem between operation and other costs related to the same aspects of the contract. IAP's

discussion responses corrected this labeling issue by realigning costs among operational ELINs and maintenance ELINs. These corrections resulted in reallocations among *16 different ELINs*. IAP also corrected simple technical mistakes, such as an incorrect labor rate or the omission of a multiplier.

(citations omitted, emphasis in original, and brackets added). The Price Evaluation Panel met on October 6, 2008,

> to review each response to determine/ensure if the offerors provided an adequate response for each discussion question, what changes were made to their proposal, how their revised prices compared with the Government estimate and with each other, and if proposed prices were unbalanced or presented any additional concerns. Prices submitted by all three firms were reviewed to determine if prices were more balanced in comparison with previously submitted FFP [firm fixed price] & IQ [indefinite quantity] prices.

(brackets added).

The Price Evaluation Panel also examined proposed overhead rates, general and administrative rates, and profit rates. The Panel's report indicated that IAP submitted prices "for all option years and for all SLINs and ELINs. The Contractor [IAP] provided adequate responses/pricing methodology for each discussion question." According to the Panel, IAP's pricing was balanced across option years, and the "FFP–IDIQ pricing structure presented by IAP is not so problematic that is [sic] considered unbalanced." The Panel concluded that "IAP's pricing appears to be complete, realistic and reasonable and presents a low risk of failing to perform the stated requirements. There is no indication that further discussion questions would provide better pricing results." Plaintiff's and Offeror C's responses to the discussion questions were similarly reviewed. The Panel noted that "[t]he three offerors did make significant changes to the allocation of prices between ELINs and SLINs in response to the discussion questions they were given," concluded that the Panel had no further discussion questions, and recommended that final proposal revisions be requested.

Final proposal revisions were requested on November 25, 2008, received on December 3, 2008, and reviewed by the Price Evaluation Panel on December 9, 2008, for price changes, to compare revised prices to the Independent Government Estimate, and to ascertain whether the revised prices were unbalanced. The Panel Report indicated price analysis was conducted on IAP's price proposal, that the proposal appeared to reflect a general understanding of the work to be performed, and that prices were submitted for all ELINs and SLINs. Indicating that prices were reviewed at the line item level, and not just at the overall price level, the Panel noted that IAP reduced their pricing by [deleted] "by [deleted]." The Panel concluded that IAP's pricing structure was not considered unbalanced, that IAP's pricing proposal was low risk, and that further discussion questions were not needed. The Panel made a similar review of plaintiff's final price proposal, which was unchanged from its previous submission, and noted that the [deleted]. The Panel concluded that there had been adequate price competition, in terms of a comparison of the final price proposal of the three offerors in the competitive range. Attached to the Price Evaluation Panel Report were revised price proposals of IAP's, plaintiff's, and Offeror C's prices, broken out at the ELIN and SLIN level, which had been prepared by the Panel.[8] The above language of the Panel Report and the attached ELIN/SLIN spreadsheets prepared by the Panel, indicate that a line by line comparison of pricing was conducted by the Navy throughout the evaluation process. Plaintiff has argued to the contrary, but has not provided convincing evidence in support of its argument.

The Source Selection Advisory Board (SSAB) noted that all of the price proposals were less than the Independent Government Estimate, at [deleted] below (plaintiff), [deleted] below (IAP) and [deleted] below (Offeror C), and concluded that, therefore, the overall prices compared "favorably" to the Government Estimate. The SSAB further noted that adequate price competition had been obtained, that the three offerors' total prices were within 10% of each other, and that prices, therefore, were "realistic and reasonable." The SSAB recommended IAP for award, and the Source Selection Authority adopted the recommendation.

A review by the court of IAP's responses to the discussion questions leads to the conclusion that the responses reasonably addressed the Navy's initial concerns about any possible unbalanced pricing. FAR 15.404–1(g) provides that line items shall be analyzed and, if they appear to be unbalanced, the contracting officer shall consider the potential for paying higher prices, and *may* reject an offer if it is deemed too risky. Given IAP's detailed responses to discussion questions on pricing, the Navy had a reasonable basis to accept IAP's final price proposal as the best value and consider IAP's prices not unbalanced. *See Textron, Inc. v. United States,* 74 Fed.Cl. at 325–26 (the agency identified a concern with unbalanced price, which was resolved and the protest ground rejected by the court, noting that procurement officials have substantial discretion to make best value determinations) (citing *E.W. Bliss Co. v. United States* 77 F.3d 445, 449 (Fed.Cir. 1996)).

In the *Al Ghanim* case, which was relied on by plaintiff, on the issue of whether the awardee's pricing was unbalanced, the court found error on the part of the government because what was compared by the government was "the total price submitted by each offeror to the total price contained in the government estimate. One chart [in *Al Ghanim* ] organizes the offerors from lowest to highest total price, while the other lists the offerors in numerical order. Nowhere in the memorandum do the two project managers state that the individual CLIN prices in the proposals were analyzed." *Al Ghanim Combined Group Co. Gen. Trad. & Cont. W.L.L. v. United States,* 56 Fed.Cl. 502, 514 (2003) (footnote omitted). "[N]o cost analy-

---

8. The court granted defendant's unopposed motion for leave to complete the administrative record with additional spreadsheets attached to the December 16, 2008 Price Evaluation Panel Report, but which inadvertently had been omitted from the record. The complete spreadsheets provide pricing data at the ELIN (exhibit line item number) and SLIN levels, and were of assistance to the court to properly review the bid protest.

sis whatsoever" was performed in *Al Ghanim*. *Id.* at 513.The court in *Al Ghanim* also distinguished two other cases in which unbalanced pricing was not found:

> In *J & D Maintenance and Services v. United States,* 45 Fed.Cl. 532 (1999), the court decided a post-award bid protest in which the protestor alleged that the awardee's pricing structure was unbalanced. In rejecting the protestor's argument, the court noted repeatedly that the Navy, the agency at issue, had performed the requisite cost analysis. For example, the administrative record reflected that the "Navy specifically focused on whether [the awardee's] bid was unbalanced." 45 Fed. Cl. at 534. The Navy also "explicitly concluded that [the awardee's] offer was not unreasonably priced and did not pose an unacceptable risk of performance." *Id.* at 537. Similarly, in *Red River Service Corp.,* Comp. Gen. Dec. B–282634, *et al.,* 99–2 CPD ¶ 31, 1999 WL 644445, 1999 U.S. Comp. Gen. LEXIS 144 (July 15, 1999), the awardee's proposal evidenced unbalanced pricing, but the Navy engaged in extensive pre-award discussions with the awardee that were reflected in the administrative record. The Navy requested, for example, that the offeror justify its proposed prices for many of the fixed-price and indefinite-quantity line items. The offeror responded to the Navy's concerns, explaining, *inter alia,* that "its pricing was based on its own competitive pricing strategy...." 1999 WL 644445, at *2, 1999 U.S. Comp. Gen. LEXIS 144, at *6. Satisfied that its pricing structure did not pose an unacceptable risk, the Navy awarded the contract to the offeror.

(brackets and omission in original).

*Al Ghanim Combined Group Co. Gen. Trad. & Cont. W.L.L. v. United States,* 56 Fed.Cl. at 514. Like *J & D Maintenance* and *Red River,* and unlike *Al Ghanim,* the Navy in the present case engaged in extensive pre-award discussions with offerors, asking the offerors to justify their prices, and after reviewing revised proposals and ultimately concluding that IAP's pricing structure did not pose an unacceptable risk, awarded to IAP.

The court is mindful of the context in which these issues are raised. For example, the court in *J & D Maintenance* makes a critical distinction which is operative in the present case:

> There is a fundamental difference between unbalanced bids in sealed bid RFPs, and those in best value RFPs. In advertised or sealed bid procurements, the lowest priced responsive bidder receives the award. In such procurements, a mathematically unbalanced bid creates doubt as to price, which makes the bid non-responsive. 48 C.F.R. § 15.814.
>
> In contrast, in a "best value" procurement, such as here, the agency considers other factors in addition to price in making award and a different FAR provision governs. A mathematical imbalance was not enough here to cause the bid to be rejected. 48 C.F.R. § 15.404. Rather, we find that the FAR and RFPs only prohibit *materially* unbalanced bids, and that Ashes's [the awardee] bid would only be materially unbalanced if it posed an unacceptable risk to the government, which it does not.

*J & D Maintenance and Services v. United States,* 45 Fed.Cl. at 536–37 (brackets added). The present procurement also is a best value procurement. Plaintiff has not convinced the court that IAP's pricing was materially unbalanced.

The GAO advisory opinion similarly found no basis to conclude that IAP's final price proposal was unbalanced and stated, "[i]n any event, the record shows that the Navy conducted a risk assessment and determined the risks to the government associated with IAP's pricing were acceptable." *Academy Facilities Management,* B–401094.3, Advisory Opinion, at 16 (Comp.Gen. May 21, 2009).

In Count V, the plaintiff alleges that: the Navy's price realism evaluation was fundamentally flawed and violated FAR 15.404–1(d). FAR 15.404–1(d) states that:

> (1) Cost realism analysis is the process of independently reviewing and evaluating specific elements of each offeror's proposed cost estimate to determine whether the estimated proposed cost elements are realistic for the work to be performed;

reflect a clear understanding of the requirements; and are consistent with the unique methods of performance and materials described in the offeror's technical proposal.

(2) Cost realism analyses shall be performed on cost-reimbursement contracts to determine the probable cost of performance for each offeror.

\* \* \*

(3) Cost realism analyses may also be used on competitive fixed-price incentive contracts or, in exceptional cases, on other competitive fixed-price-type contracts when new requirements may not be fully understood by competing offerors, there are quality concerns, or past experience indicates that contractors proposed costs have resulted in quality or service shortfalls. Results of the analysis may be used in performance risk assessments and responsibility determinations. However, proposals shall be evaluated using the criteria in the solicitation, and the offered prices shall not be adjusted as a result of the analysis.

48 C.F.R. § 15.404–1(d); *see also Alabama Aircraft Indus., Inc.–Birmingham v. United States,* 83 Fed.Cl. 666, 696 (2008) ("An unrealistically low price can indicate that the offeror does not understand the work to be done.... [A]cceptance of an unrealistically low price with a resulting lack of sufficient funds in the contract—may pose a risk of poor performance or even a lack of capability to perform (nonresponsibility)." (quoting Ralph C. Nash & John Cibinic, *Price Realism Analysis: A Tricky Issue,* 12 No. 7 Nash & Cibinic Rep. ¶ 40 (1998))). In this regard, the solicitation itself states that "Price realism *may* be conducted to determine if the *overall* price proposed is realistic for the work to be performed and reflects and [sic] understanding of the requirements submitted in the technical proposal." (emphasis added).

Plaintiff notes that, as to the initial price evaluation, reflected in the September 8, 2008 Price Evaluation Board Report, IAP's [deleted] line items drew the following comment from the Navy evaluators: "The vari-ances between the Contractor's proposed price and the IGE may indicate that the Contractor does not have a clear understanding of the requirements and the level of effort." This concern elicited the following Navy request to IAP: "Please review the pricing, adjust your pricing if deemed necessary, and provide a detailed rationale to support your proposed prices with an explanation of your pricing methodology." Plaintiff argues that the final proposal revision prices "for numerous line items continued to vary from the IGE by significant magnitudes, reflecting a lack of common understanding between IAP and the Navy concerning the nature of the work to be performed under these line items." Plaintiff alleges that: "The Navy in this procurement attempted a price realism evaluation, but violated FAR § 15.404–1(d) and abused its discretion by relying initially on the flawed IGE, and then on a superficial comparison of total prices."

The solicitation itself provided that "[p]rice realism *may* be conducted to determine if the overall price proposed is realistic for the work to be performed and reflects and [sic] understanding of the requirements submitted in the technical proposal." (emphasis added). This discretionary, as opposed to mandatory, approach under the present facts is consistent with FAR 15.404–1(d)(3), which states that: "Cost realism analyses *may* also be used on competitive fixed-price incentive contracts or, in exceptional cases, on other competitive fixed-price-type contracts when new requirements may not be fully understood by competing offerors[.]" 48 C.F.R. § 15.404–1(d)(3) (emphasis added). In addition to the statement that cost realism *may* be used, the solicitation in this case provided that price proposals would be evaluated using "one or more" of several listed price analysis techniques, including a comparison of the offerors' proposed prices, a comparison of pricing data with the technical proposals, and a comparison of proposed prices with the Independent Government Estimate.

On October 6, 2008, the Price Evaluation Panel (PEP) reviewed the offerors' responses to discussion questions, compared the IGE with the proposed changes to price proposals, with overhead rates, general and administra-

tive rates and profit rates, and compared the offerors' proposed prices with each other. Based on that review, the PEP recommended that final proposal revisions be requested. The revised price proposals and the Independent Government Estimate are shown in the following table:

| | Firm Fixed Price | Indefinite Quantity | Total |
|---|---|---|---|
| Offeror C | [deleted] | [deleted] | [deleted] |
| IAP | [deleted] | [deleted] | $186,673,244.48 |
| AFM | [deleted] | [deleted] | [deleted] |
| IGE | [deleted] | [deleted] | [deleted] |

On December 9, 2008, the PEP conducted a review of final, proposal revision prices, evaluating changes to proposals, comparing prices with the Independent Government Estimate and comparing offerors' prices with each other. The Navy's December 16, 2008, final Price Evaluation Panel (PEP) Report, drawing conclusions with respect to IAP's final proposed price proposal, stated that:

Based on Final Price Revisions submitted, price analysis was conducted and the PEP found the revised proposal submitted by IAP to be:

\* \* \*

*Realistic* in that the revised overall price is proportional to the volume of work being performed and that it appears to reflect a general understanding of the work to be performed.

\* \* \*

Based on the above, IAP's pricing remains to be [sic] complete, realistic and reasonable and presents a low risk of failing to perform the stated requirements. There is no indication that further discussion questions would provide better pricing results.

(emphasis in original).

Plaintiff was concerned that "the tables attached to the Final PEP Report do not even identify IAP's final prices for the IDIQ ELINs; instead, these table only show the final prices for the FFP ELINs." Actually, the final Price Evaluation Panel Report, and the *complete* attachments to the PEP Report, which contain spreadsheets broken down to the exhibit line item number level, reflect both FFP and IDIQ ELINs. Plaintiff nevertheless charges that the price realism analysis was based on a "superficial comparison of total prices." The record does not support a finding of superficiality. Intervenor summarizes the reasonable, rather thorough process which occurred, as follows:

The initial PEP report identified specific areas where IAP's price appeared to be understated. Tied to that report, the Navy questioned IAP about specific costs in *dozens of areas* ([including] cost-related questions in [deleted], among many other areas). Some of those questions resulted in IAP making price modifications ([including] increases in labor rates, material costs, and service call costs). Others resulted in IAP's submission of additional information to justify the proposed costs. ([For example,] "We consulted with [our lead [deleted] vendor, who] confirmed that their initial square footage was accurate. Therefore, we made no changes to the price."). Overall, this process increased IAP's proposed costs by [deleted].

(brackets added).

Plaintiff also charges that the price realism analysis relied on a "flawed IGE." The Navy, however, followed its solicitation, employing price analysis techniques, including a comparison of offerors' prices with each other, in addition to comparisons with the Independent Government Estimate. A similar issue arose in the case of *Moore's Cafeteria Services,* in which the Independent Government Estimate was challenged as flawed and inflated. *Moore's Cafeteria Services v. United States,* 77 Fed.Cl. 180, 187 (2007), *aff'd,* 314 Fed.Appx. 277, No. 2007–5141, 2008 WL 732032 (Fed.Cir. Mar. 20, 2008). The government in *Moore's Cafeteria Services* defended the IGE as reasonable, but also argued that, even if the IGE were inaccurate, adequate price competition supported the award decision. *Id.* at 188. The court in *Moore's Cafeteria Services* cited FAR 15.404–1(b)(2), for the proposition that "'adequate price competition establishes price reasonableness.' Price competition is a preferred technique of price analysis. 48 C.F.R.

§ 15.404–1(b)(3). The CO [contracting officer] need not perform any technique of price analysis other than price competition unless the CO 'determines that information on competitive propose prices ... is not available or is insufficient to determine that the price is fair and reasonable. 48 C.F.R. § 15.404–1(b)(3).' " *Id.* at 188 (omission in original). The court in *Moore's Cafeteria Services* concluded that, "regardless of whether the IGE is flawed," the plaintiff has not demonstrated prejudice, because price reasonableness was established through competition. *Id.*

The FAR itself recognizes the Independent Government Estimate in price analysis. One price analysis technique is "[c]omparison of proposed prices with independent Government cost estimates." 48 C.F.R. § 15.404–1(b)(2)(v). Furthermore, FAR 15.404–1(b)(3) states that two other techniques are preferred price analysis techniques—the first, cited above in *Moore's Cafeteria Services,* was adequate price competition. The second preferred technique is "[c]omparison of previously proposed prices and previous Government and commercial contract prices with current proposed prices for the same or similar items, if both the validity of the comparison and the reasonableness of the previous price(s) can be established." 48 C.F.R. § 15.404–1(b)(2)(ii). The significance of this second FAR-preferred technique is that the Base Operating Support contract is not a new effort, and the IGE was based, in part, on data from prior contracts. The September 8, 2008, Price Evaluation Board Report noted that: "The IGE is based upon standard estimating guides, which include the NAVFAC Engineering Performance Standards, RS Means estimating guides, *historical data (previously proposed prices)* and independent material prices." (emphasis added).

The court in *Alabama Aircraft Industries* noted the discretion afforded agencies in the area of price realism:

[The] FAR lacks an explicit directive to contracting agencies mandating the use of any particular analytical tool in evaluating the reasonableness and realism of an offer's price. *See* 48 C.F.R. § 15.404–1(b)–(e). In these circumstances, courts have accorded contracting agencies considerable leeway in evaluating price. *See, e.g., Honeywell, Inc. v. United States,* 870 F.2d 644, 648 (Fed.Cir.1989); *International Outsourcing Servs. v. United States,* 69 Fed.Cl. 40, 48 (2005) (stating that " 'the nature and extent of an agency's price realism analysis are matters within the agency's discretion'.") (citation omitted). However, that discretion can be abused. An agency's price-realism analysis lacks a rational basis if the contracting agency, for example, made "irrational assumptions or critical miscalculations." *OMV Med., Inc. v. United States,* 219 F.3d 1337, 1344 (Fed. Cir.2000).

*Alabama Aircraft Indus., Inc.–Birmingham v. United States,* 83 Fed.Cl. at 696; *see also Labat–Anderson Inc. v. United States,* 50 Fed.Cl. at 106 ("[T]he nature and extent of an agency's price realism analysis are matters within the agency's discretion."). The court finds that the Navy's price analysis techniques were reasonable, compliant with the FAR, consistent with the solicitation, and the conclusion of reasonable pricing within the Navy's discretion. The GAO advisory opinion concluded similarly: "As the Navy's price realism determination was consistent with the methodology established in the solicitation, we see no basis to find it improper." *Academy Facilities Management,* B–401094.3, Advisory Opinion, at 15 (Comp.Gen. May 21, 2009).

This result is consistent with the GAO case of *Electronic Hardware Corporation,* which is quoted at length due to the similarities with the present procurement:

EHC [Electronic Hardware Corporation] protests that the agency failed to conduct an adequate price realism analysis. Although agencies are required to perform some sort of price or cost analysis on negotiated contracts to ensure that the agreed-price is fair and reasonable, where, as here, the award of a fixed-price contract is contemplated, a proposal's price realism is not ordinarily considered, since a fixed-price contract places the risk and responsibility for contract costs and resulting profit or loss on the contractor. Federal Acquisition Regulation (FAR) sect. 15.404–1.

However, an agency may, as did DLA [Defense Logistics Agency] here, provide for a price realism analysis in the solicitation for such purposes as measuring an offeror's understanding of the solicitation requirements, or to avoid the risk of poor performance from a contractor who is forced to provide goods or services at little or no profit. The depth of an agency's price realism analysis is a matter within the sound exercise of the agency's discretion.

\* \* \*

EHC challenges the depth of DLA's price analysis, arguing that "there is no discussion in any of [the agency's] final evaluation documents regarding the cost realism of Grauch's [the awardee] offer." The protester concludes that the agency "did nothing to investigate Grauch's significantly lower prices or to confirm that Grauch could deliver the requested items at these prices," and therefore, "failed to conduct a proper price realism analysis." The protester notes that Grauch's proposed prices after negotiations were "still 32% below [the agency's] Minimum Objective for Lot I and 35% below [the agency's] Minimum Objective for Lot II."

We find from our review of the contemporaneous record that the agency had concerns with the low prices proposed by the offerors for certain CLINs in Lots I and II, and that it handled these concerns in a reasonable manner. That is, the agency's price negotiation memorandum shows that the agency was aware and accurately calculated the number of CLINs on which Grauch's and EHC's proposed prices fell within the agency's criteria for requiring verification for price realism purposes, that the agency brought these CLINs to the offerors' attention during negotiations, and was satisfied with the responses it received. There is no requirement that the agency conduct a "cost realism" analysis in evaluating proposals for a fixed-price contract as asserted by the protester, nor is an agency required to "investigate" in the context of a price realism analysis whether Grauch can deliver the items for the prices

proposed as required by the resultant contract.

*Electronic Hardware Corporation,* B–295345, 2006 CPD ¶ 5, at 4–5, 2005 WL 3681971, at \*3–4 (Comp.Gen. Jan. 28, 2005) (other citations omitted, brackets added and footnotes omitted). Similarly, the Navy in the current case before this court was concerned with price variances, which it brought to the offerors' attention during discussions, and "was satisfied with the responses it received," in the language of *Electronic Hardware Corporation.* This court, therefore, similarly concludes that the Navy handled pricing realism in an appropriate manner.

■■■ In Count VI, the plaintiff alleges that: the Navy treated offerors unequally in Its evaluation of technical proposals, in violation of FAR 15.303. Plaintiff cites to FAR 15.303(b), which states that: "The source selection authority shall—(3) [e]nsure consistency among the solicitation requirements, notices to offerors, proposal preparation instructions, evaluation factors and subfactors, solicitation provisions or contract clauses, and data requirements[.]" 48 C.F.R. § 15.303(b); *see also Gentex Corp. v. United States,* 58 Fed.Cl. at 653 ("The Air Force violated the 'fundamental principle of government procurement . . . that [contracting officers] treat all offerors equally and consistently apply the evaluation factors listed in the solicitation.'" (quoting *TLT Constr. Co. v. United States,* 50 Fed.Cl. 212, 216 (2001))).

Plaintiff argues that the Navy gave credit to IAP for certain features of its proposal, but failed to give plaintiff credit for the same or similar features in its proposal. In its complaint, plaintiff offers the following scenario: "But for the Navy's errors, there is a substantial chance that AFM would have been considered the technically superior proposal, and that a price-technical tradeoff would have identified AFM as the best value to the Navy."

Examining the charge of unequal evaluation, for Factor B, Technical Approach/Methods, under Strengths, the Navy listed a [deleted] Strength for IAP, based on [deleted] ideas. The single [deleted] Strength was based on an IAP [deleted] capability, a [de-

leted],[9] and [deleted].[10] Plaintiff also received a Strength for proposing a [deleted] like IAP, but complains that it, too, had [deleted], which did not receive special mention. However, on items the Navy gave IAP a single Strength for the above [deleted] ideas, the Navy gave plaintiff an equivalent single Strength, based on the [deleted]. IAP proposed [deleted] ideas and received a single Strength, whereas plaintiff also received a single Strength, based on a single, cited [deleted] idea, so the resulting harm from the Navy's action appears to be *de minimis*.

For Factor C, Management, the Navy listed IAP's proposed use of an [deleted] as a Significant Strength. Both IAP and AFM received a Strength for [deleted] under Factor B, Technical Approach/Methods, but plaintiff complains about the Factor C, Management rating, which it did not receive.[11] Plaintiff also complains about the Factor C, Management, Strength given IAP for [deleted]. Plaintiff proposed the same [deleted], but did not receive a Strength for it.

Defendant has provided a reasonable basis for the distinctions in treatment for all but two of the features cited by plaintiff ( [deleted] ). However, plaintiff cannot demonstrate prejudice for any such discrepancies, because IAP garnered a total of [deleted] Significant Strengths and Strengths in the technical evaluation from the Technical Evaluation Board, compared to [deleted] for the plaintiff, resulting in higher technical evaluation ratings for IAP. Based on the proposals from plaintiff and IAP, AFM still would not be technically superior, still would not have the lower-priced proposal and, in the court's view, would not have a substantial chance for award.

Plaintiff received [deleted] for Factor B, Technical Approach/Methods, [deleted] for Management, and [deleted] for the overall technical evaluation. A Technical Evaluation Board (TEB) reviewed the final proposal revisions of the offerors in the competitive range, and produced the following ratings, which were agreed with and adopted by the Source Selection Advisory Board and, ultimately, by the Source Selection Authority:

| Technical Evaluation Factors | Offeror C | IAP | AFM |
| --- | --- | --- | --- |
| A: Relevant Experience | [deleted] | [deleted] | [deleted] |
| B: Technical Approach/Methods | [deleted] | [deleted] | [deleted] |
| C: Management | [deleted] | [deleted] | [deleted] |
| D: Safety | [deleted] | [deleted] | [deleted] |
| E: Small Business Subcontracting Effort | [deleted] | [deleted] | [deleted] |
| Overall Technical Evaluation Rating | [deleted] | E | [deleted] |
| Past Performance Rating | [deleted] | E | [deleted] |

In the above table, E is Excellent, VG is Very Good, S is Satisfactory, and M is Marginal.

Plaintiff has not demonstrated that IAP was undeserving of the ratings listed in the table above, or that its own ratings would have changed. In this regard, at oral argument, plaintiff acknowledged that the technical evaluation allegations, standing alone, would not carry the day and warrant remand for an additional round of discussions and final proposal revisions.

■ In Count VII, the plaintiff alleges that: the Navy employed unstated evaluation criteria in violation of 10 U.S.C. § 2305(b)(1) and FAR Part 15. Section 2305(b)(1) states that: "The head of an agency shall evaluate sealed bids and competitive proposals and make an award based solely on the factors specified in the solicitation." 10 U.S.C. § 2305(b)(1) (2006). FAR 15.303(b) states that: "The source selection authority shall— (4) [e]nsure that proposals are evaluated based solely on the factors and subfactors contained in the solicitation (10 U.S.C.

**9.** Defendant and intervenor argue that IAP had [deleted], whereas AFM had a [deleted], without a [deleted], and that this was a reasonable basis for the credit given to IAP.

**10.** Defendant and intervenor argue that IAP would have [deleted], while AFM's [deleted], thereby justifying the credit given to IAP.

**11.** Defendant and intervenor argue that IAP's [deleted] was promised [deleted], whereas AFM did not make a comparable commitment, justifying the higher rating for IAP.

§ 2305(b)(1) and 41 U.S.C. § 253b(d)(3))[.]" 48 C.F.R. § 15.303(b).

Plaintiff complains about two special mentions by the Navy on IAP's proposal, reflected in the October 15, 2008, Technical Evaluation Board Report, which, under Technical Factor A, Relevant Experience, were listed as one Strength:

The following are not requirements of the RFPS but are added value to the Government:

* * *

[deleted].

[deleted][.]

The Source Selection Advisory Board Report, based on final proposal revisions, listed IAP's "[deleted]," as an additional service of "particularly high value" to the Navy. With respect to Count VII, plaintiff argues that, "[b]ut for the Navy's errors, there is a substantial chance that AFM would have been considered the technically superior proposal, and that a price-technical tradeoff would have identified AFM as the best value to the Navy."

■■■ The court in *Banknote Corporation of America, Inc.*, summarized the law in this area:

It is hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the solicitation. This requirement is firmly rooted in the Competition in Contracting Act (CICA) ... which indicate[s] that an agency shall evaluate competitive proposals and assess their qualities solely on the factors and subfactors specified in the solicitation. *See* 10 U.S.C. §§ 2305(a)(2)(A), 2305(a)(3)(A) (2000).... That said, an agency still has "great discretion in determining the scope of an evaluation factor." *Forestry Surveys and Data v. United States*, 44 Fed.Cl. 493, 499 (1999). Consistent with these precepts, in a case such as this, a protester must show that: (i) the procuring agency used a significantly different basis in evaluating the proposals than was disclosed; and (ii) the protester was prejudiced as a result—that it had a substantial chance to receive the contract award but for that error.

* * *

[I]t is well-settled that "a solicitation need not identify each element to be considered by the agency during the course of the evaluation where such element is intrinsic to the stated factors." *Analytical & Research Tech., Inc. v. United States,* 39 Fed.Cl. 34, 45 (1997)[.]

*Banknote Corp. of Am., Inc. v. United States,* 56 Fed.Cl. 377, 386–87 (2003), *aff'd,* 365 F.3d 1345 (Fed.Cir.2004) (footnote and other citations omitted).

The solicitation did not explicitly require experience in [deleted] or [deleted], but such experience comes within the ambit of Technical Evaluation Factor A—Relevant Experience. The solicitation states that offerors shall describe their experience in "alteration, demolition, minor construction and other related functions for facilities and utility systems," which defendant argues embraces [deleted] experience, and experience in "sustainment of site utilities, infrastructure, and building structures and systems," which defendant argues embraces [deleted], particularly with respect to telecommunication utilities, and building structures and systems, such as security cameras. Defendant also argues that the adjectival rating "Excellent" is defined, in part, by exceeding performance and capability requirements, and providing unique, innovative solutions and resources. The November 18, 2008, Source Selection Advisory Board characterized as "value added items," the ability to perform [deleted], and [deleted] experience. The October 15, 2008 Technical Evaluation Board Report listed [deleted] and [deleted] under Strengths, as "added value to the Government," under technical evaluation "Factor A, Relevant Experience." The added value to the government stemmed from IAP's added expertise and experience, and reasonably falls within the ambit of the solicitation language quoted above. Based on the scope of the Relevant Experience technical evaluation factor, the court concludes that the Navy did not violate the unstated evaluation criteria rules. The Navy did not use a "significantly different

basis" in evaluating the proposals than was disclosed, *Banknote Corp. of Am., Inc. v. United States*, 56 Fed.Cl. at 387.

Secondly, a protester must be prejudiced as a result of the use of unstated evaluation criteria, that is, the protester must demonstrate that it had a substantial chance to receive the contract award, but for the agency's error. *Id.* In this regard, the court concludes that, even if [deleted] and [deleted] capabilities were removed from consideration, given the superior number of Strengths and Significant Strengths awarded to IAP ( [deleted] for IAP to [deleted] for plaintiff), and IAP's lower price, the removal from consideration of these two additional factors would have no effect on the Navy's award to IAP. Plaintiff has not demonstrated a substantial chance for award. In its advisory opinion, the GAO reached the same result for both Counts VI and VII, stating: "Given that there is no evidence in the record that the alleged errors would have altered the relative technical merit of the IAP and AFM proposals or affected the agency's source selection determination, we see no basis to conclude that AFM was prejudiced in any way by the alleged errors in the agency's evaluation of technical proposals." *Academy Facilities Management*, B-401094.3, Advisory Opinion, at 12 (Comp.Gen. May 21, 2009).

The United States Court of Appeals for the Federal Circuit has stated:

> We note first that our standard of review in *post-award bid protest* cases is narrow. We may only set aside the contract if the VA's [Veterans Affairs] actions were arbitrary and capricious, or otherwise not in accordance with the law.... The burden is therefore on the plaintiff to show that, but for the alleged error in the procurement, it likely would have been awarded the contract. A protestor's burden is higher for a negotiated procurement because the contracting officer has broad discretion when engaging in an inherently judgmental process.

*Galen Med. Assocs., Inc. v. United States*, 369 F.3d at 1331 (emphasis in original); *see also Info. Tech. & Applications Corp. v. United States*, 316 F.3d at 1323, that, ("Un-

der our deferential standard of review, we conclude that these agency actions were not 'arbitrary and capricious,' 'not in accordance with law' or 'unsupported by substantial evidence.'"); *Advanced Data Concepts, Inc. v. United States*, 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." (citing *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. at 285, 95 S.Ct. 438)). Under this standard of review, plaintiff does not prevail on the merits.

*Injunctive Relief*

Plaintiff's complaint sought a permanent injunction, and plaintiff also filed a motion for a preliminary injunction. As a general rule, courts should interfere with the government procurement process "only in extremely limited circumstances." *Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. at 380 (quoting *CACI, Inc.–Fed. v. United States*, 719 F.2d at 1581) (quoting *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1372 (Fed.Cir.1983)); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (" 'It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion.' ") (quoting 11A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2948, pp. 129–130 (2d ed.1995)) (emphasis and footnotes omitted in original); *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568 (Fed.Cir.) (finding a preliminary injunction to be a "drastic and extraordinary remedy that is not to be routinely granted"), *reh'g denied, en banc suggestion declined* (Fed.Cir.1993), *cert. denied*, 510 U.S. 1092, 114 S.Ct. 923, 127 L.Ed.2d 216 (1994); *ManTech Telecomms. & Info. Sys. Corp. v. United States*, 49 Fed.Cl. at 64 (emphasizing that injunctive relief is not routinely granted) (citing *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982)).

■■■■ The decision on whether or not to grant an injunction is within the sound discretion of the trial court. *See FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed.Cir. 1993); *Asociacion Colombiana de Exportadores de Flores v. United States*, 916 F.2d 1571, 1578 (Fed.Cir.1990). Confirming the difficult nature of obtaining injunctive relief in a bid protest case, the United States Court of Appeals for the Federal Circuit has stated that even if a trial court finds that the government's actions in soliciting and awarding a contract were arbitrary, capricious, or not in accordance with law, the trial court retains discretion on whether to issue an injunction. *See PGBA, LLC v. United States*, 389 F.3d 1219, 1225–26 (Fed.Cir.2004) (finding that the statutory scheme for reviewing procurement decision "does not deprive a court of its equitable discretion in deciding whether injunctive relief is appropriate," and that 28 U.S.C. § 1491(b)(4) "does not automatically require a court to set aside an arbitrary, capricious, or otherwise unlawful contract award."). Once injunctive relief is denied, "the movant faces a heavy burden of showing that the trial court abused its discretion, committed an error of law, or seriously misjudged the evidence." *FMC Corp. v. United States*, 3 F.3d at 427.

■■■■ To obtain a temporary restraining order or preliminary injunction, the plaintiff must carry the burden of establishing entitlement to extraordinary relief based on the following factors:

(1) likelihood of success on the merits of the underlying litigation, (2) whether irreparable harm is likely if the injunction is not granted, (3) the balance of hardships as between the litigants, and (4) factors of the public interest.

*Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1344 (Fed.Cir.2008) (citing *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1338–39 (Fed.Cir.2003)), *reh'g and reh'g en banc denied* (Fed.Cir.2009); *see also U.S. Ass'n of Imps. of Textiles and Apparel v. U.S. Dep't of Commerce*, 413 F.3d 1344, 1346 (Fed.Cir. 2005) (citing *Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (Fed.Cir.1983)); *see also Pharm. Research and Mfrs. of Am. v. Walsh*, 538 U.S. 644, 670, 123 S.Ct. 1855, 155 L.Ed.2d 889 (2003) (requiring a movant for preliminary injunction to prove that the "probability of success on the merits of its claims ... the risk of irreparable harm, the balance of the equities, and the public interest" weigh in the movant's favor); *Somerset Pharms., Inc. v. Dudas*, 500 F.3d 1344, 1346 (Fed.Cir.2007) ("To establish entitlement to a preliminary injunction a movant must establish a reasonable likelihood of success on the merits." (citing *Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.*, 357 F.3d 1319, 1325 (Fed.Cir.2004))); *Seaborn Health Care, Inc. v. United States*, 55 Fed.Cl. 520, 523–24 (2003); *OAO Corp. v. United States*, 49 Fed. Cl. 478, 480 (2001) ("When deciding if a TRO [temporary restraining order] is appropriate in a particular case, a court uses the same four-part test applied to motions for a preliminary injunction." (quoting *W & D Ships Deck Works, Inc. v. United States*, 39 Fed.Cl. 638, 647 (1997))); *Dynacs Eng'g Co. v. United States*, 48 Fed.Cl. at 616. The standard of proof required for injunctive relief is a preponderance of the evidence, *Textron, Inc. v. United States*, 74 Fed.Cl. at 287, *Bannum, Inc. v. United States*, 60 Fed.Cl. 718, 723–24 (2004), or, demonstration of a fact as "more likely than not," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S.Ct. 2499, 2513, 168 L.Ed.2d 179 (2007) (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983)).

■■■■ The test for a permanent injunction is almost identical to that for a temporary restraining order or preliminary injunction, but rather than the likelihood of success on the merits, a permanent injunction requires actual success on the merits. *See Centech Group, Inc. v. United States*, 554 F.3d at 1037; *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987) (holding that the standard for permanent injunction is the same as that for preliminary injunction, with the one exception being that the plaintiff must show actual success on the merits, rather than likelihood of success). In *PGBA, LLC v. United States*, the Federal Circuit set out the test for a permanent injunction, stating that a court must consider:

(1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.

*PGBA, LLC v. United States,* 389 F.3d at 1228–29 (citing *Amoco Prod. Co. v. Vill. of Gambell, Alaska,* 480 U.S. at 546 n. 12, 107 S.Ct. 1396); *see also Nat'l Steel Car, Ltd. v. Canadian Pacific Ry., Ltd.,* 357 F.3d at 1325 (finding that a plaintiff who cannot demonstrate actual success on the merits cannot prevail on its motion for permanent injunctive relief); *PHT Supply Corp. v. United States,* 71 Fed.Cl. at 12; *Int'l Res. Recovery, Inc. v. United States,* 64 Fed.Cl. 150, 159 (2005); *Hunt Bldg. Co. v. United States,* 61 Fed.Cl. 243, 279, *opinion modified,* 63 Fed. Cl. 141 (2004); *Bean Stuyvesant, L.L.C. v. United States,* 48 Fed.Cl. 303, 320–21 (2000) (citing *Hawpe Constr., Inc. v. United States,* 46 Fed.Cl. 571, 582 (2000), *aff'd,* 10 Fed. Appx. 957 (Fed.Cir.2001)); *ATA Def. Indus., Inc. v. United States,* 38 Fed.Cl. 489, 505 n. 10 (1997) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success.'" (quoting *Amoco Prod. Co. v. Village of Gambell, Alaska,* 480 U.S. at 546, 107 S.Ct. 1396 n. 12)). Plaintiff has not prevailed on the merits. Therefore, the extraordinary remedy of injunctive relief is unavailable under the facts presented.

## CONCLUSION

For the foregoing reasons, plaintiff's motions for judgment on the administrative record and for preliminary and permanent injunctive relief are denied. Defendant's and intervener's motions for judgment on the administrative record are granted. The Clerk's Office shall enter judgment in favor of defendant and intervenor, and dismiss the complaint, with prejudice.

**IT IS SO ORDERED.**